IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Kaya O'Connor,<br><br>Plaintiff,<br><br>v.<br><br>Trans Union, LLC; and Bridgecrest<br>Acceptance Corporation,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Kaya O'Connor ("Plaintiff" or "Ms. Connor") brings this action on an individual basis, against Trans Union, LLC ("Trans Union") and Bridgecrest Acceptance Corporation ("Bridgecrest") (collectively, "Defendants") alleging the following:

## **INTRODUCTION**

1.     Plaintiff Ms. O'Connor brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq.* for falsely publishing and verifying that she is responsible for the fraudulent loan/charge that Defendants Plaintiff did not make and is not responsible for because of identity theft/fraud.

2.     More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1]

3.     Federal Law requires that each consumer reporting agency ("CRA")

---

[1] Victims of Identity Theft, 2018, 1. U.S. Dept. of Justice, Bureau of Justice Statistics. April 2021, NCJ 256085.

1

protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests.

4.     This lawsuit arises from Defendants' refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

5.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

6.     Unfortunately, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Trans Union acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

7.     The ongoing technological advances in data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

8.     These CRAs sell information to readily paying subscribers (*i.e.,* retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may

2

be applying for retail credit, housing, employment, or a car or mortgage loan.

9. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

10. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

11. The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

12. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

13. The FCRA also requires CRAs to conduct a reasonable

reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer.

14. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted to not prevent consumers from benefiting from his or her credit and obtaining new credit.

15. Considering these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

16. The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable investigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

17. An investigation must be a searching inquiry calculated to resolve the actual substance of the dispute rather than a superficial process by which the dispute may never be resolved.

18. In or around March or April 2025, Plaintiff was a victim of identity theft when another individual opened a fraudulent Bridgecrest account to finance/purchase a vehicle using Plaintiff's personal information.

19. This fraudulent Bridgecrest account was reported on Plaintiff's consumer reports with the national CRAs.

4

20. Plaintiff took all steps necessary under federal law and otherwise to remove the fraudulent Bridgecrest account from her consumer reports. She disputed this information and provided the necessary supporting documentation, including an FTC Identity Theft Affidavit and Police Report wherein Plaintiff provided information regarding the identity theft.

21. Nevertheless, Bridgecrest attributed the loan balances Plaintiff even though she provided a detailed explanation and objectively verifiable evidence including FTC Identity Theft Report and Police Report.

22. Had Bridgecrest performed an even cursory investigation, it would have realized that Plaintiff was an identity theft victim.

23. Bridgecrest has instead sought to harass Plaintiff into paying by continuing collection efforts and continuing to report false information to one or more of the CRAs.

24. There is no evidence that exists that Plaintiff is responsible for the charges and loans that Bridgecrest is trying to strap her with.

25. Initially, Trans Union blocked the disputed tradeline.

26. However, Trans Union soon reinserted the disputed tradeline.

27. Bridgecrest has not relented in attempting to extract money from Plaintiff and has used credit reporting to squeeze and intimidate her into paying.

28. At the time of the filing of the Complaint, both Equifax and Experian stopped reporting the fraudulent Bridgecrest account. Only Trans Union reinserted the inaccurate information onto Plaintiff's consumer/credit reports.

29. Thus, Plaintiff's claims arise out of the Defendants' plainly deficient investigations considering Plaintiff's disputes and notice that she was a victim of identity theft.

30. Specifically, an unauthorized individual stole and used Plaintiff's identity to fraudulently obtain a vehicle.

5

31. To date, Defendants have refused to conduct a reasonable investigation of Plaintiff's claim of identity theft and that fraudulent Bridgecrest account charges.

32. Additionally, Bridgecrest has reported the fraudulent charges to Trans Union despite being aware that the fraudulent charges were not made by Plaintiff, but were the result of theft of Plaintiff's identity, in violation of the Fair Credit Reporting Act ("FCRA").

33. Plaintiff has sent identity theft notifications to Defendants, which include an FTC ID Theft Report and Police Report to establish she did not make the fraudulent purchase or otherwise authorize anyone to make those purchases.

34. Despite receiving notice that the Bridgecrest account was the product of identity theft, Trans Union has failed to suppress or remove or block the identity theft information from Plaintiff's credit file and/or reports, in violation of the FCRA, 15 U.S.C. § 1681 *et. seq.*

35. Upon information and belief, despite receiving at least one automated credit dispute verification ("ACDV") from Defendant Trans Union, Defendant Bridgecrest has failed to properly reinvestigate Plaintiff's dispute, and amend its reporting accordingly.

36. Accordingly, Plaintiff brings claims against Trans Union for failing to follow reasonable procedures to assure maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i, for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, § 1681c-2.

37. Further, Plaintiff also brings claims against the Furnisher, Defendant

Bridgecrest, for failing to conduct a reasonable investigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft and/or other fraud upon the Furnisher, and for failing to delete the disputed information from Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

38. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## JURISDICTION AND VENUE

39. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

40. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants regularly transacts business within this District and are otherwise subject to personal jurisdiction in this District.

## PARTIES

41. Plaintiff is a retired veteran who currently resides in Michigan and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

42. Defendant Trans Union, LLC ("Trans Union") is a corporation with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of Michigan, including within this District. Defendant Trans Union can be served through its registered agent, CSC-LAWYERS INCORPORATING SERVICE (COMPANY), 3410 Belle Chase Way Ste 600, Lansing, MI 48911.

43. Defendant Trans Union is a "consumer reporting agency," as defined

7

in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

44. The information that Defendant Trans Union collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Trans Union also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

45. Defendant Trans Union collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Defendant Trans Union collects and maintains information about them. Not only that, but consumers cannot remove information that Defendant Trans Union collects and maintains about them from the Trans Union database. Further, Defendant Trans Union sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Defendant Trans Union sold.

46. Defendant Bridgecrest is a corporation organized under the laws of Delaware and has its principal place of business in Arizona. Defendant Bridgecrest can be served through its registered agent, CSC-LAWYERS INCORPORATING SERVICE (COMPANY), 3410 Belle Chase Way Ste 600, Lansing, MI 48911.

47. Defendant Bridgecrest is authorized to do business in the State of Michigan, including within this District.

48. Defendant Bridgecrest is a "Furnisher" as defined in 12 CFR 1022.41 and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Bridgecrest

regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Defendant Bridgecrest, is an entity that reports information about consumers to consumer reporting agencies (CRAs), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. § 1681s-2b of the FCRA.

49. During all times pertinent to this Complaint, all Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

50. Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

51. The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

52. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

53. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of

commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, regarding the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

54. Congress also recognized that CRAs such as Trans Union "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

55. For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

56. The first form of protection is the "block." When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

      a)    Appropriate proof of the identity of the consumer;

      b)    A copy of an identity theft report;

      c)    The identification of such information by the consumer; and

      d)    A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).

57. The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

58. Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer and provide that alert along with any credit score generated in using that file, for one year beginning on the date of

the request. Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

59.     The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as Trans Union.

60.     A security freeze prohibits a CRA from disclosing contents of a consumer report subject to the freeze to any person requesting the consumer report.[2] 15 U.S.C. § 1681c-1(i)(1). Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

61.     Once placed, a security freeze does not expire. A CRA can remove a security freeze only at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A). Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze." 15 U.S.C. § 1681c-1(i)(3)(C).

62.     The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may only release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c). No consumer reporting

---

[2] Certain statutorily exempt entities can still request and receive a frozen report. *See* 15 U.S.C. § 1681c-1(i)(4). But those exemptions do not apply to the matter at hand.

11

agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. 15 U.S.C. § 1681e(a).

63.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

64.     Similarly, the FCRA also imposes a duty upon the Furnishers, such as Defendant Bridgecrest, to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. § 1681s-2b).

65.     The FCRA provides consumers with a private right of action against consumer reporting agencies, such as Trans Union, and data furnishers such as Defendant Bridgecrest, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## FACTUAL ALLEGATIONS

**A.     The Identity Theft Incident**

66.     Plaintiff is a veteran who served in the United States Army but now suffers from a disability. Plaintiff currently resides in Michigan.

67.     Plaintiff was the victim of identity theft involving the purchase of a vehicle using a Bridgecrest account, which Plaintiff was not involved with and did not authorize.

68.     The Bridgecrest Account is a fraudulent account that was opened without my knowledge or consent, due to identity theft fraud.

69. Plaintiff made a police report and an FTC Identity Theft Affidavit detailing the fraud and identity theft.

70. The police report identifies the vehicle that was fraudulently purchased using my personal information without Plaintiff's knowledge or consent. The Bridgecrest Account pertains to the vehicle listed in the police report, a Black 2016 Chevy Tahoe with the VIN number listed on the police report (1GNSKBKC0GR462237).

71. To Plaintiff's knowledge, the vehicle has since been repossessed.

72. Plaintiff did not authorize use of the Bridgecrest by the fraudsters, take out a loan or authorize anyone else to obtain a using her personal information.

73. Plaintiff did not initiate, authorize or benefit from the purchases or loans made on the Bridgecrest Account.

**B. Bridgecrest Continually Disregards/Thwarts Plaintiff's Resolution Efforts**

74. Plaintiff made various attempts to reach out to Bridgecrest regarding the fraudulent account for many months.

75. These efforts were futile.

76. Plaintiff's attempts to resolve the issue directly with Bridgecrest were thwarted by Bridgecrest despite Plaintiff's efforts to reach Bridgecrest and Plaintiff's submission of complaints about the failure to investigate.

77. Bridgecrest knew or should have known that the disputed account/loan and waas the result of identity theft, or fraud based on the information and materials Plaintiff provided to substantiate the identity theft.

78. Despite this knowledge, Bridgecrest has continually sought to extract money from Plaintiff by pursuing her for the fraudulent account and refusing to cease reporting the fraudulent account on Plaintiff's consumer reports.

79. Bridgecrest deems Plaintiff responsible for the unauthorized

13

loan/charges.

80. Bridgecrest failed to produce any evidence on which it relied in support of its decision to deny Plaintiff's dispute.

81. By contrast, the seller Carvana, took action once Plaintiff reported the identity theft and to Plaintiff's knowledge promptly repossessed the vehicle.

**C.      Plaintiff's Multiple Disputes to Trans Union**

82. After months of going back and forth with Bridgecrest, Plaintiff learned that she needed to dispute to the Credit Bureaus to prevent further damage to his credit files and reports.

83. Plaintiff made numerous disputes with Trans Union regarding the inaccurate information during the summer of 2025, September/October of 2025 and then in January 2026.

84. Defendant Trans Union was reporting the Account as an Installment Account with a Balance of $29,033 and a Pay Status of "**Repossession**." This type of reporting is highly derogatory and detrimental to Plaintiff's credit standing and ability to obtain or use credit.

85. Plaintiff provided sufficient information to identify her credit file and sufficient information to support his position and resolve the dispute. Notably, the other national consumer reporting agencies are not reporting the same inaccurate information as Trans Union.

86. Plaintiff provided a detailed explanation and objectively verifiable evidence including FTC Identity Theft Report and Police Report along with her dispute to Trans Union.

87. Plaintiff requested that the identity theft information be blocked/deleted from her credit file.

**D.      Defendant Trans Union's Unreasonable Dispute Reinvestigations**

88. In or about July/August 2025, September/October 2025, and January

14

2026, Defendant Trans Union received multiple disputes from Plaintiff and Plaintiff's request that identity theft information/fraudulent Bridgecrest account be blocked/deleted from her credit file.

89. On August 19, 2025, Defendant Trans Union issued a letter to Plaintiff in response to Plaintiff's dispute that indicated that it verified the fraudulent Bridgecrest account as accurate.

90. On November 19, 2025, Defendant Trans Union issued a letter to Plaintiff in response to Plaintiff's dispute and indicated that Trans Union verified the fraudulent Bridgecrest account as accurate.

91. On or about February 10, 2026, Defendant Trans Union issued a letter to Plaintiff in response to Plaintiff's subsequent dispute indicating that Trans Union completed its investigation and verified the fraudulent Bridgecrest account as accurate. Consequently, Defendant Trans Union continued to report the inaccurate information against Plaintiff, including, a reported a past due balance of $16,563 and reported status of repossession.

92. In the dispute response letters, Defendant Trans Union acknowledged receipt of Plaintiff's dispute, wherein Plaintiff request the inaccurate information be blocked/deleted due to identity theft.

93. Defendant Trans Union refused to correct the disputed inaccuracy, i.e., delete the Bridgecrest account that was the product of identity theft. Defendant Trans Union continued to report Plaintiff as liable/responsible for this alleged debt.

94. Upon information and belief, Defendant Trans Union sent Defendant Bridgecrest an automated credit dispute verification ("ACDV") pursuant to Plaintiff's dispute, because this is required by the FCRA.

95. Defendant Bridgecrest received Defendant Trans Union's ACDV and did not adequately investigate Plaintiff's dispute by performing a searching

15

inquiry designed to determine whether the Plaintiff had made the disputed charges and received the loans.

96. Defendant Trans Union failed to adequately review all the information provided to it by Plaintiff or to conduct a true reinvestigation utilizing the information that was provided by the Plaintiff.

97. Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation with respect to the disputed information, failing to review all relevant information available to it, and failing to act on disputed charges and loan were the product of identity theft.

98. Furthermore, Trans Union communicated consumer reports and consumer information about the Plaintiff to numerous third parties that either contained the inaccurate and disputed Bridgecrest tradeline information or the consumer information was formulated to include the inaccurate and disputed Bridgecrest tradeline information, including for hard inquiries, soft inquiries, promotional reasons, and account review.

**E. Bridgecrest's Unreasonable Dispute Investigation**

99. Plaintiff continued to plead her case to Defendant Bridgecrest and dispute the unauthorized account on her credit report.

100. Defendant Bridgecrest received Plaintiff's dispute.

101. Defendant Bridgecrest failed to adequately review all the information provided by Plaintiff.

102. Defendant Bridgecrest verified the disputed information as accurate in response to Defendant Trans Union's ACDV.

103. Defendant Bridgecrest continues to report the fraudulent loan/charge against Plaintiff—the victim of the identity theft.

104. Defendant Bridgecrest violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information,

16

failing to review all relevant information available to it, and failing to recognize that the disputed loan/charge were the product of identity theft.

## PLAINTIFF'S DAMAGES

105.   Plaintiff did exactly what he should have done upon realizing he was the victim of identity theft and fraud – she notified Bridgecrest, Carvana, the FTC, local law enforcement and the national CRAs.

106.   Plaintiff has repeatedly followed up with or attempted to follow-up with Defendants Bridgecrest and Trans Union by phone and in writing.

107.   Plaintiff filed a Police Report and an FTC ID Theft Report as well.

108.   Plaintiff disputed with Defendant Trans Union numerous times, as well as the other credit bureaus that all deleted and have not reinserted the Bridgecrest tradeline.

109.   Plaintiff identified herself as an identity theft victim.

110.   Defendant Bridgecrest has repeatedly denied Plaintiff's identity theft and fraudulent loan/charge claims - failing to provide Plaintiff with any of the investigation materials it has reviewed in coming to that determination.

111.   Trans Union has repeatedly denied Plaintiff's identity theft and fraudulent loan/charge claims –failing to provide Plaintiff with any of the investigation materials they have reviewed in coming to that determination.

112.   As a direct result of Defendant Bridgecrest's ardent refusal to remove the disputed debt and to stop furnishing the same to Trans Union, Defendants have continued to saddle Plaintiff with nearly $30,000.00 in reported debt which was the product of fraud and identity theft.

113.   Further, as a direct result of Defendant Bridgecrest verification of the disputed debt to Trans Union, Defendant Bridgecrest has continued to saddle Plaintiff with nearly $30,000.00 in reported debt which was the product of fraud and identity theft.

17

114. As a direct result of Trans Union' ardent refusal to block or delete the disputed information, Trans Union have continued to saddle Plaintiff with nearly $30,000.00 in reported debt which was the product of fraud and identity theft.

115. As a direct result of Trans Union' refusal to conduct a reasonable reinvestigation of Plaintiff's disputes, Trans Union have continued to saddle Plaintiff with nearly $30,000.00 in reported debt which was the product of fraud and identity theft.

116. As a direct result of Trans Union' ardent refusal to block or delete the Due to Defendants' ardent refusal to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

117. Further, and due to Defendants' inexplicable refusal to remove and/or block information that is the product of identity theft and fraud from an identity theft victim's credit file, Plaintiff expended countless hours disputing with the Defendants.

118. It has taken him an incredible amount of time to document the events, secure her credit, and track down supporting documents, all of which affected his ability to spend time doing other worthwhile things that he enjoys.

119. In addition to impacting his daily activities, dealing with the consequences of Defendants' conduct has caused the Plaintiff to worry for her financial future. It has taken a toll on Plaintiff.

120. Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety about her credit and being able to access credit in the future. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes. Further, Plaintiff reasonably believes that the fraudulent inquiries have negatively

impacted and depressed her credit score. Plaintiff fears Defendants' conduct has caused irreparable damage to her credit score.

121. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

122. At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

123. After initially learning of the identity theft, Plaintiff did all the right things to protect herself and to ensure his credit file was secure and even going so far as to ensure no potential creditor lost funds due to identity theft.

124. Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from the Defendants, Plaintiff feels a surge of panic each time he receives another communication from the Defendants. Plaintiff's ongoing stress and anxiety regarding the situation have negatively affected her and her relationships.

125. Defendants have had years of notice in the form of federal lawsuits, despite it all, the Defendants failed to take any better steps to protect the Plaintiff here.

126. The internal policies and procedures of Trans Union do not appear to place any value on their obligations under the FCRA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access to consumers' reports without authorization or permissible purpose.

127. As a standard practice, Trans Union do not conduct independent

19

investigations in response to consumer disputes. Instead, they merely parrot the response of the data furnishers, like Defendant Bridgecrest here, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

128. Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' violations of the FCRA are willful.

129. Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

130. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing the product of identity theft.

131. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental

20

anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendants.

132. Plaintiff has also suffered strain on her marriage due to the stress caused by this ordeal, which has increased Plaintiff's stress and fear concerning being able to rent or purchase a home.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(Defendant Trans Union)**

133. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

134. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

135. On numerous occasions, the Trans Union prepared patently false consumer reports concerning Plaintiff.

136. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, Trans Union readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff borrowed and owed nearly $30,000.00, was in default and had her automobile repossessed.

137. A third-party reviewing Plaintiff's credit reports would reasonably infer that Plaintiff was a bad credit risk.

138. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

139. Trans Union has specifically been admonished by federal courts that its reinvestigation and consumer reporting procedures are not reasonable and thus violate the FCRA.

140. As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

141. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Trans Union.

142. Trans Union conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

143. Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Defendant Trans Union)

144.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

145.   The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day limitation for the completion of such an investigation. Id.

146.   The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

147.   Plaintiff disputed the inaccurate information with Trans Union and requested that it correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the nearly $30,000.00 fraudulent debt and repossession furnished by Defendant Bridgecrest and allegedly owed by Plaintiff for purchases and loans that were the product of fraud and identity theft.

148.   Plaintiff disputed the identity theft information to Trans Union, to no avail.

149.   Plaintiff supported his disputes with a copy of an FTC ID Theft Report and an IC3 report, as well as reference to the analyst from the United States Secret Service investigating the fraud.

150.   Despite actual and implied knowledge that Plaintiff was the victim

23

of identity theft, and in response to Plaintiff's disputes, Trans Union conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

151. Plaintiff expended resources in the form of time and money to repeatedly dispute the information that was the product of fraud and identity theft with Trans Union.

152. Trans Union's refusal to remove the information that was the product of fraud and identity theft lent credibility to the disputed debt and suggested to all third parties that Plaintiff did in fact owe that debt.

153. Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

154. As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

155. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger,

frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Trans Union.

156. Trans Union's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

157. Trans Union has been put on specific notice by federal courts that its investigation and consumer reporting procedures are unreasonable and therefore violate the FCRA.

158. Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681c-2**
**Failure to Block Identity Theft Information**
**(Defendant Bridgecrest)**

159. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

160. Plaintiff submitted ample evidence of the fact that he was an identity theft victim, which Trans Union initially allowed Plaintiff to believe that Trans Union had deleted the disputed information from his consume report.

161. Plaintiff supported the fact that he was an identity theft victim by providing an FTC ID Theft Report and Police Report.

162. Trans Union should have blocked the account information resulting from identity theft, but instead only temporarily deleted it.

163. Approximately within the next month after informing the Plaintiff

that the tradeline was deleted, Trans Union reinserted the damaging, inaccurate, and the disputed Bridgecrest tradeline.

164. As a result of Trans Union' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

165. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Trans Union.

166. Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

167. Trans Union' conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

168. Trans Union has been on notice from federal courts for almost two decades that its consumer reporting and reinvestigation procedures are unreasonable and therefore violate the FCRA.

169. Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n

and/or § 1681o.

## COUNT IV
### 15 U.S.C. § 1681s-2(b)
**Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer (Defendant Bridgecrest Only)**

170. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

171. At all times pertinent hereto, Bridgecrest was a "person" as that term is defined by 15 U.S.C § 1681a(b) and a "furnisher of information" providing information about Plaintiff to the major credit reporting agencies.

172. Bridgecrest has a duty to provide accurate information to consumer reporting agencies. 15 U.S.C. § 1681s-2(a).

173. Bridgecrest has a duty to promptly correct inaccurate information after receiving notice of a consumer's credit dispute from a consumer reporting agency. 15 U.S.C § 1681s-2(a).

174. Bridgecrest failed to follow reasonable procedures to assure it only provided maximally accurate information about Plaintiff to the consumer reporting agencies.

175. On at least one occasion within the past two years, by example only and without limitation, Bridgecrest also violated 15 U.S.C § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's disputes.

176. Defendant Bridgecrest refused to remove information that was the product of identity theft and fraud.

177. Bridgecrest has an obligation under 15 U.S.C. § 1681s-2(b) to conduct an investigation after a consumer reporting agency notifies them that a consumer has disputed the accuracy of the information they furnished; review all relevant information during their investigation of the dispute; report the results of

the investigation to the relevant consumer reporting agencies; and if the investigation reveals that the furnished information was incomplete or inaccurate, notify every consumer reporting agency that received the deficient information of the investigation results.

178. If the investigation reveals that the disputed information is incomplete, inaccurate, or unverifiable, it must be modified, deleted, or permanently blocked. 15 U.S.C. § 1681s-2(b)(1)(E).

179. Trans Union forwarded Plaintiff's disputes to Bridgecrest.

180. Each time Bridgecrest was notified of the disputed issues with the Account, it failed to properly investigate Plaintiff's dispute.

181. Bridgecrest does not conduct any investigation of disputed accounts but merely verifies accounts for data conformity with its internal records.

182. Bridgecrest has been on notice for over 18 years that investigations must be meaningful, searching inquiries. *Johnson v. MBNA Am. Bank*, 357 F.3d 426 (4th Cir. 2004).

183. Bridgecrest violated 15 U.S.C. § 1681s-2(b)(1)(E) when it failed to delete and permanently block the Account from being reported to Trans Union.

184. Bridgecrest violated 15 U.S.C § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's disputes after being notified of the disputes by Trans Union.

185. Bridgecrest failed to review all relevant information while investigating Plaintiff's disputes, in violation of 15 U.S.C. § 1681s-2(b)(1)(B).

186. Bridgecrest's actions in the instant matter are representative of their normal policies and procedures.

187. Bridgecrest's regular procedures only require them to complete a cursory review of consumer disputes without conducting a reasonable investigation, regardless of the it content, magnitude, or frequency.

188. In sum, Bridgecrest's conduct violated § 1681s-2(b) of the FCRA.

189. Bridgecrest knew or should have known about their obligations under the FCRA. These obligations are well established in the plain language of the FCRA, promulgations made by the Federal Trade Commission (FTC) and Consumer Financial Protection Bureau (CFPB), and in well-established case law.

190. Therefore, Bridgecrest acted consciously in failing to adhere to their obligations under the FCRA.

191. Bridgecrest willfully and/or negligently violated the foregoing provisions of the FCRA in the following manner:

    a. By willfully and/or negligently failing to conduct an investigation of the inaccurate information that Plaintiff disputed;

    b. By willfully and/or negligently failing to review all relevant information concerning Plaintiff's disputes;

    c. By willfully and/or negligently failing to report the results of its investigation of the inaccurate information concerning Plaintiff to all credit reporting agencies;

    d. By willfully and/or negligently failing to modify or delete incomplete or inaccurate information in Plaintiff's file after conducting an investigation;

    e. By willfully and/or negligently failing to permanently block the reporting of the inaccurate information disputed by Plaintiff and continuing to report and furnish inaccurate or incomplete information in Plaintiff's file to the credit reporting agencies; and

    f. By willfully and/or negligently failing to comply with all requirements imposed on "furnishers of information" by 15 U.S.C.§ 1681s-2(b).

192. As a result of this conduct, action, and inaction of Bridgecrest, Plaintiff has suffered actual damages, as detailed herein.

193. As a result of Defendant Bridgecrest's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

194. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant Bridgecrest.

195. Defendant Bridgecrest's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Bridgecrest was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

196. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Bridgecrest in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief against Defendants:

a) Declaratory judgment that Defendants violated the FCRA, 15 U.S.C.

§ 1681 *et seq.*;

b)      An award of actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1681, *et seq.*;

c)      An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and § 1681o; and

d)      Such other and further relief as the court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 3rd day of April 2026,

HADOUS|CO. PLLC

/s/Nemer N. Hadous
Nemer N. Hadous (P82285)
1 Parklane Blvd., Suite 729 East
Dearborn, Michigan 48126
Telephone: (313) 415-5559
E-mail: nhadous@hadousco.com
Attorneys for Plaintiff

31